**DAVIDSON & KAFFER, PLLC**
**8700 E. Pinnacle Peak Road, Suite 221**
**P.O. Box 27500**
**Scottsdale, Arizona 85255**
**Telephone:   (480) 585-3100**
**Facsimile:  (480) 585-8585**
Frederick E. Davidson - State Bar No. 013199
Chad R. Kaffer - State Bar No. 022909
Josh G. Funkhouser - State Bar No. 032900
FED@davidsonlaw.net
*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| William Brill, an individual; Jon Corbisez, an individual; and William Brill and Jon Corbisez on behalf of United Global Partners, LLC, an Arizona limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> Nicholas Andrews, an individual; David Prom, an individual; USA Bioenergy LLC., an Arizona limited liability Company; Nicholas Andrews, Inc., an Arizona corporation d/b/a NB Andrews and Associates, <br><br> Defendants. | Case No.: **2:19-cv-05844-SPL** <br><br> **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINT** <br><br> (*Oral Argument Requested*) |

Defendants Nicholas Andrews, David Prom, USA Bioenergy LLC., and Nicholas Andrews, Inc. d/b/a NB Andrews and Associates ("Defendants") hereby respond in opposition to Plaintiffs' Motion for Leave to File Amended Complaint (Doc. No. 19) ("Plaintiffs' Motion") filed by Plaintiffs William Brill and Jon Corbisez, ("Plaintiffs") on March 20, 2020.  Plaintiffs' Motion should be denied because Plaintiffs' amendment of

the Complaint would be futile, as:

   a.    Plaintiffs cannot establish diversity jurisdiction as Plaintiffs should be required to pursue a derivative action on behalf of Plaintiff United Global Partners, LLC ("Plaintiff UGP") because the debts allegedly owed by Defendants, if assuming *arguendo* those debts were legitimate, would be payable to Plaintiff UGP and not Plaintiffs individually; and payment directly to Plaintiffs would materially adversely affect the interests of Plaintiff UGP's creditors; and,

   b.    Arizona's Statute of Frauds, at A.R.S. § 44-101(5) prohibits Plaintiffs from asserting that an oral agreement between the parties existed where that agreement was not to be performed within one year form the making thereof.

This Response to Plaintiffs' Motion for Leave to File Amended Complaint (this "Response") is supported by the following Memorandum of Points and Authorities, along with all other pleadings already filed in this case.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    FACTUAL BACKGROUND

   *1.    The Original Complaint*

On December 17, 2019, Plaintiffs filed their original Verified Complaint (Doc. No. 1) (the "Verified Complaint"), alleging that William Brill and Jon Corbisez, and Defendants Nicholas Andrews and David Prom, are members of Plaintiff United Global Partners, LLC, which is an Arizona limited liability company. *See* Complaint (Doc. 1), ¶ 1. In the Verified Complaint, Plaintiffs allege causes of action for Declaratory Relief (Count I), Breach of Fiduciary Duty (Count II), and Conversion (Count III). *See* Complaint (Doc. 1), *gen*. At the heart of Plaintiffs' Complaint, Plaintiffs allege, under oath, that Defendants converted assets of Plaintiff UGP for Defendants' own benefit and in violation of the parties' operating agreement. *See* Complaint (Doc. 1), ¶¶ 1, 14, 15, 19,

33-35.

2.     *The Operating Agreement*

Additionally, in Plaintiffs' Verified Complaint, Plaintiffs' claims rely substantially upon that certain Amended and Restated Operating Agreement of United Global Partners, LLC dated May 15, 2019 (the "UGP Operating Agreement"), pursuant to which Plaintiffs and Defendants Nicholas Andrews and David Prom became Members of UGP.[1]  *See* Complaint (Doc. 1), ¶ 14 and at Ex. "A".  A copy of the UGP Operating Agreement is attached hereto as **Exhibit A**.

3.     *The Avalon Gardens Agreement*

Plaintiffs, in the Proposed Amended Complaint, allude to agreements with third-parties for the propagation, harvesting and sale of hemp seeds and plants.  *See* Proposed Complaint, ¶¶ 14, 17.  Specifically, in those allegations, Plaintiff UGP is referring to that certain Agreement for the Cultivation, Production and Sale of Industrial Hemp Related

---

[1]Defendants recognize that while not a Motion to Dismiss under Rule 12, *Fed. R. Civ. P.*, this Response essentially attacks Plaintiffs' attempt to confer jurisdiction upon this Court.  The Ninth Circuit Court of Appeals has specifically dealt with the various exceptions to the general rule pertaining to the presentation of "matters outside the pleadings," and to that end, has held that Rule 12, *Fed. R. Civ. P.*, does not require summary judgment treatment of a motion that attaches or relies upon: (1) documents that are integral to plaintiff's claims [*Gov't Computer Sales Inc., v. Dell Mktg.*, 199 Fed. Appx. 636, 638 (9th Cir. 2006), *citing Parrino v. FHP, Inc.*, 146 F.3d 699, 706 & n. 4 (9th Cir.1998)]; (2) documents that are attached to plaintiff's complaint [*Amfac Mortg. Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 429 (9th Cir. 1978)]; and, documents of which the court may take judicial notice [*San Francisco Patrol Special Police Officers v. City & County of San Francisco*, 13 Fed. Appx. 670, 675 (9th Cir. 2001)].  All of the documents referred to in and attached to this Response are either attached to Plaintiff's Verified Complaint, documents that are integral to Plaintiffs' claims regarding debts to third parties and the agreement between the parties, or public records of which the Court may take judicial notice.

Products dated June 20, 2019 (the "Hemp Sale Agreement"), by and between Plaintiff UGP, and Avalon Gardens Slow Food Enterprises, LLC ("Avalon Gardens"), an Arizona limited liability company. A copy of the Hemp Sale Agreement is attached hereto as **Exhibit B**[2]. Notably, the Hemp Sale Agreement was executed by Plaintiff William Brill as "CEO" of UGP. *Id*.

4.       *Plaintiff UGP's Third-Party Debt*

Additionally, in the Proposed Amended Complaint, Plaintiffs refer to third-party debts of Plaintiff UGP. *See* Proposed Amended Complaint, at ¶¶ 16-19. Indeed, Plaintiff UGP currently has outstanding debt pursuant to two promissory notes, due according to their original terms on December 31, 2019 and March 31, 2020, respectively. Plaintiff UGP entered into that certain Promissory Note dated September 23, 2019 (the "UGP-Larson Note"), by and between Plaintiff UGP, as Maker, and Jim Larson, Ron Stalica, Grant King and Norm Sendler, as the Noteholders, pursuant to which Plaintiff UGP borrowed $100,000.00, originally scheduled to be repaid on or before December 31, 2019, along with a $20,000.00 increase. A copy of the UGP-Larson Note is attached hereto as **Exhibit C**.

Plaintiff UGP also entered into that certain Promissory Note dated September 10, 2019 (the "UGP-Rosenberg Note") by and between Plaintiff UGP, as maker, and Marc Rosenberg, as the Noteholder. A copy of the UGP-Rosenberg Note is attached hereto as

[2]The Hemp Sale Agreement is attached as a matter integral to Plaintiffs' Proposed Amended Complaint and which Plaintiffs cannot dispute; which the court may consider without treatment as a Motion for Summary Judgment. *See  Gov't Computer Sales Inc.*, 199 Fed. Appx. 636, 638 (9th Cir. 2006), *citing Parrino v. FHP, Inc.*, 146 F.3d 699, 706 & n. 4 (9th Cir.1998) *supra*.

**Exhibit D**[3]. Notably, Plaintiff William Brill executed the UGP-Rosenberg Note as "CEO" of Plaintiff UGP. *See* UGP-Rosenberg Note, Ex. D. Pursuant to the UGP-Rosenberg Note, Plaintiff UGP borrowed $100,000.00, and originally agreed to repay the same plus $20,000.00, by no later than March 31, 2020. *See* UGP-Rosenberg Note, Ex. D. The UGP-Rosenberg Note remains unpaid and, therefore, delinquent as of the filing hereof.

   5.  *Defendants' Motion to Dismiss for Lack of Jurisdiction*

On February 28, 2020, Defendants filed their Motion to Dismiss (Doc. No. 13), arguing that Plaintiffs' Complaint failed to confer original jurisdiction upon the Court due to Plaintiffs' assertion of federal question jurisdiction under 28 U.S.C. § 2201 related to declaratory judgment actions, which cannot in and of itself confer original jurisdiction upon the Court without some other, separate basis for jurisdiction. On March 20, 2020, Plaintiffs filed Plaintiffs' Response to Motion to Dismiss (Doc. No. 17) ("Plaintiffs' Response"), concurring with Defendants' Motion to Dismiss in the conclusion that Plaintiffs' Verified Complaint did not confer jurisdiction upon the Court. *See* Plaintiffs' Response, Pg. 2, Ln. 1-7.

   6.  *Plaintiffs' Proposed Amended Complaint*

Contemporaneous with Plaintiffs' filing of Plaintiffs' Response on March 20, 2020, in an effort to establish jurisdiction, Plaintiffs filed Plaintiffs' Motion. In

---

[3]UGP-Larson Note and the UGP-Rosenberg Note are attached as matters integral to Plaintiffs' Proposed Amended Complaint and which Plaintiffs cannot dispute; which the court may consider without treatment as a Motion for Summary Judgment. *See Gov't Computer Sales Inc.*, 199 Fed. Appx. 636, 638 (9th Cir. 2006), *citing Parrino v. FHP, Inc.*, 146 F.3d 699, 706 & n. 4 (9th Cir.1998) *supra*.

Plaintiffs' Motion, Plaintiffs ask the Court to permit Plaintiffs to file an unverified Amended Complaint (the "Proposed Amended Complaint") in which Plaintiffs would effectively ignore Plaintiff UGP in order to establish diversity jurisdiction[4], and allege that Defendants breached an oral agreement for the propagation and sale of millions of dollars worth of industrial hemp seeds rather than the written operating agreement identified in Plaintiff's Verified Complaint. *See* Plaintiffs' Motion, at Ex. "A" ¶¶ 7, 12, 15, 42; *but cf.*, Verified Complaint, ¶ 14. To that end, Plaintiffs seek to assert causes of action under Arizona law for Breach of Contract (Count I), Breach of Implied Contract-Covenant of Good Faith and Fair Dealing (Count II), and Fraud in the Inducement (Count III). *See* Complaint (Doc. No. 1), *gen*.

Additionally, in the Proposed Amended Complaint, Plaintiffs allege that the parties herein agreed that Plaintiff UGP would incur debt in furtherance of the alleged joint venture for the appropriation, propagation and harvesting of hemp seeds. *See* Plaintiffs' Motion, at Ex. "A" ¶¶ 13-19. Despite Plaintiffs' acknowledgment of the existence of such creditors' claims, Plaintiffs seek to remove Plaintiff UGP as a party, and bring a direct action in an effort to recover funds that, under the allegations set forth in the Proposed Amended Complaint, would be payable to the individual Plaintiffs, not to Plaintiff UGP; this, despite the fact that Plaintiff UGP, not the individual Plaintiffs, is the obligor under both the UGP-Larson Note and the UGP-Rosenberg Note. Accordingly, as explained more fully *infra*, pursuant to A.R.S. § 29-3807, the Court should require that

[4]Indeed, in Plaintiffs' Response to Motion to Dismiss (Doc. No. 17), Plaintiffs acknowledge that the Court does not have original jurisdiction under the facts asserted in the Verified Complaint.

*BRILL et al v. ANDREWS, et al* - Defendants' Response to Plaintiffs' Motion for Leave to File Amended Complaint        Page 6 of 13

this action be brought as a derivative action on behalf of Plaintiff UGP in order to protect the rights of Plaintiff UGP's third-party creditors, which would defeat diversity jurisdiction.  Moreover, Plaintiffs cannot assert that an oral agreement exists as the parties undeniably intended to engage in their business relationship for longer than one year.  *See* A.R.S. § 44-101(5).

## II.    LEGAL ARGUMENT

Under prevailing Ninth Circuit case law interpreting Rule 15, *Fed. R. Civ. P.*, federal courts should liberally permit amendment of pleadings in most circumstances. *United States v. Gila Valley Irrigation Dist.*, 859 F.3d 789, 804 (9th Cir. 2017). Amendment should not be permitted, however, where the amendment would be futile.  *Id*.

Here, permitting Plaintiffs to amend the Verified Complaint would be futile as (a) the Court still would not have jurisdiction because Plaintiffs should be required to pursue Plaintiffs alleged claims in a derivative, rather than a direct, action on behalf of Plaintiff UGP, as a named party, in order to avoid materially and adversely affecting the rights of the third-party creditors, thereby removing any semblance of diversity jurisdiction; and, (b) Plaintiffs allegation of the existence of an oral agreement between the parties is factually incorrect based upon the allegations central to the Verified Complaint, and the Proposed Amended Complaint is facially deficient since Arizona's Statute of Frauds, at A.R.S. § 44-101(5), prohibits the assertion of an oral agreement that was not to be performed within one year of the making thereof, as is the case here.

> **A.    Plaintiffs Cannot Establish Jurisdiction in this Court as Plaintiffs' Allegations Should be Asserted in a Derivative Action to Protect Plaintiff UGP's Third-Party Creditors, Which Would In Turn Defeat Diversity Jurisdiction.**

*BRILL et al v. ANDREWS, et al* - Defendants' Response to Plaintiffs' Motion for Leave to File Amended Complaint          Page 7 of  13

*1.    A Derivative Action is Necessary to Protect Plaintiff UGP's Third-Party Creditors*

Plaintiffs cannot establish diversity jurisdiction as Plaintiffs should be required to pursue a derivative action because the amounts alleged to be owed by Defendants, assuming, solely for the purpose of this Response, those claims are legitimate (which they are not), should be payable to the entity, Plaintiff UGP, and not Plaintiffs individually; and payment directly to Plaintiffs would materially adversely affect the interests of UGP's creditors.

A.R.S. § 29-3807 provides that,

"The court, in its discretion, at any stage in a direct or derivative proceeding, may:

1. Treat a direct action as a derivative action subject to, or exempt from, any provisions of this article the court chooses and order recovery to be paid to the limited liability company if the court finds that doing so is reasonably necessary to avoid any of the following:

...

(b) Materially adversely affecting the interests of the company's creditors."

Here, Plaintiffs seek in the Proposed Amended Complaint to assert direct claims to recover monies that Defendants allegedly wrongfully withdrew from Plaintiff UGP's accounts. *See* Proposed Amended Complaint, *gen*. However, as explained *supra*, pursuant to Article VII of the UGP Operating Agreement, net profits of Plaintiff UGP are to be distributed *from Plaintiff UGP* to the Members of Plaintiff UGP. *See* UGP Operating Agreement, Ex. A, Art. VII. Cash flow is to otherwise be distributed to the Members of Plaintiff UGP in the collective discretion of the Members of Plaintiff UGP, provided that no distribution to the Members would render Plaintiff UGP insolvent. *Id*. Accordingly, even assuming *arguendo* that Plaintiffs' allegations in the Proposed

Amended Complaint were true - which they are not - Plaintiff UGP must remain a party, in a derivative action, in order to ensure that Plaintiff UGP, which is the obligor under both the UGP-Rosenberg Note and the UGP-Larson Note, first pays its lawful obligations. Then, and only then, can Plaintiff UGP distribute the net profits to the Members in accordance with the UGP Operating Agreement. Indeed, the UGP-Larson Note was, according to its terms, due and payable on December 31, 2019. To date, that Note has not been repaid. The UGP-Rosenberg Note, according to its terms, was due and payable on March 31, 2020, and was not repaid. Accordingly, by the terms of both Notes, and given the prohibition on rendering the company insolvent, the Plaintiffs should receive nothing individually until Plaintiff UGP repays or otherwise addresses its obligations under the Notes. Accordingly, a derivative action must be required under A.R.S. § 29-3807 in order to *inter alia* to protect the interests of the third party creditors.

Plaintiffs attempt to shift from a derivative action in the Verified Complaint to a direct action in the Proposed Amended Complaint must not stand. With Plaintiff UGP as a party, diversity jurisdiction does not exist (as more fully discussed *infra.*); and, as a result, granting the Plaintiffs leave to amend would be futile.

> 2. *Since the Purported Claim Must be Brought as a Derivative Claim, Diversity Jurisdiction Cannot Exist as Plaintiff UGP Shares Common Citizenship with Defendants*

The party asserting diversity jurisdiction must prove its existence. *Lew v. Moss*, 797 F.2d 747, 749 (9th Cir.1986). Diversity only exists where the citizenship of each plaintiff is different from the citizenship of each defendant. *Caterpillar Inc. v. Lewis*, 519

U.S. 61, 68, 117 S.Ct. 467, 472, 136 L.Ed.2d 437 (1996).  Because Plaintiff UGP must be included as a plaintiff in this matter, diversity is lacking because Plaintiff UGP, as a limited liability company, is a citizen of every state in which Plaintiff UGP's various members are citizens.  Plaintiffs acknowledge that Defendants are citizens of Arizona and, therefore, Plaintiff UGP is also a citizen of Arizona.  *See Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir.2006); and, Proposed Amended Complaint, ¶¶ 3-6.  Accordingly, as Plaintiff UGP must be required to be a plaintiff in this matter, Plaintiff UGP, as a citizen of both Colorado and Arizona, shares common citizenship with all Defendants and, therefore, diversity of citizenship, on which Plaintiffs base the jurisdiction of the Court (*See* Proposed Amended Complaint, ¶¶ 7, 8), is lacking.

> **B.    Plaintiffs Amendment of the Complaint Would be Futile as Plaintiffs Are, as a Matter of Law Prohibited From Asserting that an Oral Contract Existed as Alleged in Plaintiffs' Proposed Amended Complaint**

In Plaintiffs' Verified Complaint, Plaintiffs acknowledge, under penalty of perjury, the existence and validity of the UGP Operating Agreement as the operative document controlling the parties' business relationship.  Now, in the Proposed Amended Complaint, Plaintiffs allege the existence of an oral agreement which controls the parties' relationship.  However, that alleged oral agreement is prohibited from being asserted under Arizona's Statute of Frauds at A.R.S. § 44-101(5).  Indeed, that section provides,

> "No action shall be brought in any court in the following cases unless the promise or agreement upon which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged, or by some person by him thereunto lawfully authorized:
>
> ...
>
> 5. Upon an agreement which is not to be performed within one year from the

making thereof."

Pursuant to the UGP Operating Agreement at Article 2.05, the term of Plaintiff UGP was to be 50 years from the date of filing Articles of Organization with the Arizona Corporation Commission. *See* UGP Operating Agreement, Ex. A. Those Articles of Organization were filed on November 13, 2012, and, therefore, the term of Plaintiff UGP was contemplated as being from November 13, 2012 to November 13, 2062. A copy of Plaintiff UGP's Articles of Organization filed with the Arizona Corporation Commission is attached hereto as **Exhibit E**[5]. Accordingly, Plaintiffs' Proposed Amended Complaint is factually inconsistent with the factual record evidenced by the UGP Operating Agreement, coupled with Plaintiffs' prior sworn statement that the UGP Operating Agreement dealt with the same subjects alleged in Plaintiffs' Proposed Amended Complaint; to wit, the harvesting, propagation and sale of industrial hemp.

Moreover, it is clear that the parties intended that their business arrangement would not be performed within one year, as evidenced by the Hemp Sale Agreement, which Plaintiff William Brill signed on behalf of Plaintiff UGP, and agreed to engage with Avalon Gardens to pursue efforts for the cultivation, production and sale of industrial hemp for over one year, from June 20, 2019 through December 31, 2020. *See* Hemp Sale Agreement, Ex. C, Art. 1(a).

Accordingly, based on the UGP Operating Agreement and the Hemp Sale

[5]Plaintiff UGP's Articles of Organization are attached as a matter of public record of which the court may take judicial notice without treatment as a Motion for Summary Judgment. *See  San Francisco Patrol Special Police Officers,* 13 Fed. Appx. 670, 675 (9th Cir. 2001), *supra*.

Agreement alone, it is undeniable that the parties contemplated transactions would not be performed within one year. Plaintiffs' allegation of an oral contract in the Proposed Amended Complaint, therefore, cannot stand, thus rendering the requested leave to amend, futile. *See* A.R.S. § 44-101(5), *supra*. Therefore, Plaintiffs Motion must be denied.[6]

### III.    CONCLUSION

Plaintiffs' Motion should be denied as granting Plaintiff leave to file Plaintiffs' Proposed Amended Complaint would be futile due to the following: (1) Plaintiffs cannot establish diversity jurisdiction since Plaintiffs must be required to bring their alleged claims in a derivative action on behalf of Plaintiff UGP, as a named party, in order to preclude Plaintiff UGP's third party creditors from be materially and adversely impacted; and since Plaintiff UGP shares common citizenship with both Plaintiffs and Defendants; and, (2) Plaintiffs, by virtue of Arizona's Statute of Frauds at A.R.S. § 44-101(5), cannot assert the existence of an oral agreement since their agreement (i.e., the alleged oral agreement, coupled with the UGP Operating Agreement and the Hemp Sale Agreement) was not to be performed within one year from the May 15, 2019 date of the alleged oral agreement.

DATED this 3rd day of April, 2020.

By:    */s/ Josh G. Funkhouser*, Bar No. 032900
**DAVIDSON & KAFFER, PLLC**

---

[6]To the extent the alleged oral agreement constitutes a contract contemplating the sale of product for more than $500.00 [*see* Proposed Amended Complaint, ¶¶ 24, 33], then Arizona's Statute of Frauds applies and prohibits Plaintiffs' assertion of an oral agreement as well. *See* A.R.S. § 44-101(4).

*BRILL et al v. ANDREWS, et al* - Defendants' Response to Plaintiffs' Motion for Leave to File Amended Complaint    Page 12 of 13

*Attorneys for Defendants*
8700 E. Pinnacle Peak Road, Suite 221
P.O. Box 27500
Scottsdale, Arizona 85255
Tel. (480) 585-3100
Fax (480) 585-8585
Frederick E. Davidson, Esq.
Chad R. Kaffer, Esq.
Josh G. Funkhouser, Esq.

A copy of the foregoing transmitted via the Court's electronic filing system this 3rd day of April, 2020 to:

Craig A. Brand, Esq.
MYSTIC LAW P.A.
6411 South Jamaica Circle
Englewood, Colorado 80111

*/s/ Josh G. Funkhouser*

# EXHIBIT A

# AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## United Global Partners, LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT is made and entered into as of the 15th day of May 2019. The original OPERATING AGREEMENT was made and entered into as of November 8, 2012, by and between Nicholas Andrews Inc ("Member(s)"), and United Global Partners, L.L.C. (the "Company").

## ARTICLE I
## DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings:

"Act" shall mean the Arizona Limited Liability Company Act, as amended from time to time.

"Articles of Organization" shall mean the Articles of Organization of the Company as filed with the Corporation Commission of Arizona, as amended from time to time.

"Capital Contribution" shall mean any contribution to the capital of the Company in cash or property by the Member(s) whenever made.

"Cash Flow" shall mean the gross cash proceeds from the operation of the Company's business less the portion thereof used to establish Reserves for or to pay Company expenses, debt payments and capital expenditures. "Cash Flow" shall include any net cash proceeds from the sale or disposition of Company property and from the refinancing of indebtedness of the Company, shall be increased by any reduction of Reserves previously established by the Member(s), and shall not be reduced by depreciation, cost recovery, amortization or similar non-cash deductions.

"Company" shall refer to United Global Partners, L.L.C.

"Entity" shall mean any general partnership, limited partnership, limited liability partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust, foreign business organization or other business entity.

"Fiscal Year" shall mean the period terminating on December 31 of each year during the term hereof or on such earlier date on which the Member(s)'s taxable year ends.

"Initial Capital Contribution" shall mean the initial contribution to the capital of the Company pursuant to Paragraph 6.01 of the Operating Agreement.

"Member(s)" shall mean the person who executed a counter part of this Operating Agreement as a Member(s) and any Person who may hereafter become a Member(s) of the Company.

"Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions and credits of the Company in the aggregate or separately stated, as appropriate, as of the close of each Fiscal Year.

"Operating Agreement" shall mean this Operating Agreement as originally executed and as amended from time to time.

"Person" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such "Person," where the context so permits.

"Representative" shall mean the legally appointed guardian of a mentally incapacitated Member(s), the conservator of a mentally incapacitated Member(s)'s assets or the legally appointed and qualified executor or personal representative of the estate of a deceased Member(s). In the event no such guardian, executor or personal representative is appointed, then the Representative shall mean the spouse of such incapacitated or deceased Member(s), or if such Member(s) does not have a spouse or the spouse is then not living or is unable or unwilling to act, such Member(s)'s then living lineal descendants who are willing and capable of acting, one at a time in descending order of age but in no event younger than 21 years of age or, if none, such Member(s)'s then living lineal ancestors who are willing and capable of acting, one at a time and in descending order of age.

"Reserves" shall mean funds set aside or amounts allocated to reserves which shall be maintained in amounts deemed sufficient by the Member(s) for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

## ARTICLE II
## FORMATION OF COMPANY

**2.01    Formation.**    The Company shall be, or has been, organized as an Arizona limited liability company by executing and delivering Articles of Organization to the Arizona Corporation Commission in accordance with and pursuant to the Act.

**2.02    Name.**  The name of the Company is "United Global Partners, L.L.C."

**2.03    Principal Place of Business.**        The principal place of business of the company is 7440 E. Pinnacle Peak, #140 Scottsdale, AZ 85255. The Company may locate its places of business and registered office at any other place or places as the Member(s) may deem advisable.

**2.04    Registered Office and Statutory Agent.**    The Company's initial registered office shall be at the office of its statutory agent at United Global Partners, L.L.C., and the name of its initial statutory agent shall be Nicholas Andrews.  The registered office and statutory agent may be changed by the Member(s) by filing the address of the new registered office and/or the name of the new statutory agent with the Arizona Corporation Commission pursuant to the Act.

**2.05    Term.**  The term of the Company shall be fifty (50) years from the date of filing of the Articles of Organization with the Arizona Corporation Commission, unless the Company is earlier dissolved in accordance with either the provisions of this Operating Agreement or the Act.

# ARTICLE III
# BUSINESS OF THE COMPANY

**3.01    Purpose.**        The business of the Company shall be to conduct any lawful business whatsoever that may be conducted by the limited liability companies pursuant to the Act.

# ARTICLE IV
# MANAGEMENT OF THE COMPANY

**4.01    Management of Company.**  Pursuant to the Articles of Organization, the Manager has the exclusive right to manage the Company's business.  Accordingly, the Manager, as acting through the officers (if any) of the Company, shall: (i) manage the affairs and business of the Company; (ii) exercise the authority and powers granted to the Company; and (iii) otherwise act in all other matters on behalf of the Company.

**4.02    Execution of Documents.**    Any document or instrument of any and every nature, including without limitation, any agreement, contract, deed, promissory note, mortgage or deed of trust, security agreement, financing statement, pledge, assignment, bill of sale and certificate, which is intended to bind the

3

Company or convey or encumber title to its real or personal property shall be valid and binding for all purposes only if executed by the Manager.

**4.03    Action Without Meeting.**    Any action required to be taken by or on behalf of the Company may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the Member(s).

**4.04    Officers.**    The officers of the Company may consist of a President, a Treasurer and a Secretary.  The officers shall be appointed by the Member(s) and shall exercise such powers and perform such duties as are prescribed by the Member(s).  Any number of offices may be held by the same person, as the Member(s) may determine, except that no person may simultaneously hold the offices of President and Secretary.

**4.05    Term of Office.**    The officers shall hold office for the term for which they were appointed and until their successors are elected and qualified; provided, however, that any officer may be removed at any time with or without cause by the Member(s).

# ARTICLE V
# RIGHTS AND OBLIGATIONS OF MEMBER(S)S

**5.01    Limitation of Liability.**    The Member(s) will not be personally liable for any obligations, liabilities, debts or losses of the Company, whether arising in tort, contract or otherwise, except as otherwise required by law.

**5.02    Right to Indemnification.**    Subject to the limitations and conditions provided in this Article 5 and in the Act, each Person ("Indemnified Person") who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative ("Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that they were or are a Member(s) or an officer of the Company or they were or are the legal representative of or a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of a Member(s) or of an officer of the Company, shall be indemnified by the Company against judgements, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable costs and expenses (including without limitation, attorney's fees actually incurred by such Indemnified Person in connection with such Proceeding if such Indemnified Person acted in good faith and in a manner they reasonably believed to be in, or not opposed to, the best interest of the Company and, with respect to any criminal action or proceeding, had no

4

reasonable cause to believe their conduct was unlawful.  The termination of any action, suit or proceeding by judgement, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Indemnified Person did not act in good faith and in a manner which they reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal action or proceeding, that the Indemnified Person had reasonable cause to believe that their conduct was unlawful.

**5.03    Survival.**    Indemnification under this Article 5 shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder.  The rights granted pursuant to Article 5 shall be deemed contract rights, and no amendment, modification or repeal of this Article 5 shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal.

**5.04    Advance Payment.**    The right to indemnification conferred by this Article 5 shall include the right to be paid or reimbursed by the Company for the reasonable expenses incurred in advance of the final disposition of the Proceeding and without any determination as to the Indemnified Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Indemnified Person of their good faith belief that they have met the standard of conduct necessary for indemnification under this Article 5and a written undertaking, by or on behalf of such Indemnified Person, to repay all amounts so advanced if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified under this Article 5 or otherwise.

**5.05    Nonexclusivity of Rights.**    The right to indemnification and the advancement and payment of expenses conferred by this Article 5 shall not be exclusive of any other right which a Person may have or hereafter acquire under any law (common or statutory), provision of the Articles of Organization or operating Agreement, agreements, vote of Member(s)s or otherwise.

**5.06    Savings Clause.**    If Paragraph 5.02 or any portion thereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Indemnified Person as to costs, charges and expenses (including attorney" fees), judgements, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the fullest extent permitted by any applicable portion of this Article 5 that shall not have been invalidated and to the fullest extent permitted by applicable law.

# ARTICLE VI
## CONTRIBUTIONS TO THE COMPANY

**6.01    Member(s)'s Initial Capital Contributions.**    The Member(s) agrees to contribute Five Hundred Dollars ($500.00) as his Initial Capital Contribution to the Company.

**6.02    Subsequent Contributions.**    The Member(s) shall not be obligated to make any Capital Contributions to the Company other than those set forth in Paragraph 6.01.

**6.03    Loans by Member(s)s.**    The Member(s) may, but is not obligated to, loan to the Company such sums as the Member(s) determines to be appropriate for the conduct of the Company's business. Any such loans shall bear interest at one percent (1%) above the prime rate of interest charged from time to time by the Bank of America and shall be on such other terms as the Member(s) may agree.

# ARTICLE VII
## ALLOCATIONS AND DISTRIBUTIONS

**7.01    Allocation of Profits and Losses.**    All of the Net Profits and Net Losses of the Company for each Fiscal Year shall be allocated to the Member(s).

**7.02    Distributions of Cash Flow.**    Cash Flow shall be distributed to the Member(s) at such time or times as the Member(s) shall determine in his sole discretion.

**7.03    Limitation upon Distribution.**

**(a)**    No distribution or return of capital contributions may be made and paid if, after the distribution or return of a capital contribution, either:

**(1)**    the Company would be insolvent; or
**(2)**    the net assets of the Company would be less than zero.

**(b)**    The Member(s) may base a determination that a distribution or return of a capital contribution may be made under Paragraph 7.03(a) in good faith reliance upon a balance sheet and profit and loss statement of the Company represented to be correct by the person having charge of its books of account or certified by an independent public or

6

certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

## ARTICLE VIII
## DISSOLUTION AND TERMINATION

**8.01   Dissolution.**

    **(a)**    The Company shall be dissolved upon the occurrence of any of the following events:

        **(1)**    The entry of a decree of judicial dissolution under the Act;

        **(2)**    The expiration of the term fixed pursuant to Paragraph 2.05 hereof;

        **(3)**    By the written agreement of the Member(s); or

        **(4)**    Upon the death, retirement, resignation, court declaration of incompetence, bankruptcy or dissolution of the Member(s) or the occurrence of any other event which terminates the continued Member(s)ship of the Member(s).

    **(b)**    If a Member(s) who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage his person or his property, the Member(s)'s Representative may exercise all of the Member(s)'s rights for the purpose of settling his estate or administering his property.

**8.02   Winding Up, Liquidation and Distribution of Assets**

    **(a)**    If the Company is dissolved and its affairs are to be wound up, the Member(s) (or their Representative) is directed to:

        **(1)**    sell or otherwise liquidate such of the Company's assets as may be required to discharge all liabilities to the Member(s) and establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company; and

        **(2)**    distribute the remaining assets to the Member(s), such distribution to be made either in cash or in kind, as determined by the Member(s) (or his Representative).

    **(b)**    Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

    **8.03   Articles of Dissolution.**    When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and

7

assets of the Company have been distributed, articles of dissolution, as required by the Act, shall be executed and filed with the Arizona Corporation Commission.

**8.04    Effect of Filing of Articles of Dissolution.**        Upon filing of articles of dissolution with the Arizona Corporation Commission, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act.  The Member(s) (or his Representative) shall have the authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

# ARTICLE IX
## MISCELLANEOUS PROVISIONS

**9.01    Choice of Law.**        This Operating Agreement, and its interpretation, shall be governed exclusively by its terms and by the laws of the State of Arizona (other than its conflicts of laws rules) and specifically the Act.

**9.02    Amendments.**        This Operating Agreement may not be amended except in writing and signed by the Member(s).

**9.03    Headings.**        The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

**9.04    Severability.**  If any provision of this Operating Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

**9.05    Heirs, Successors and Assigns.**        Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

**9.06    Creditors.**        None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company or of any Member(s).

8

## ARTICLE X
## AMENDED COMPANY BUSINESS

1. Discussion of a proposed Amended and Restated Operating Agreement dated May 15, 2019 for United Global Partners was conducted and a vote for adoption was called.    The adoption of the Operating Agreement dated May 15, 2019 was approved to include the terms below.

2. A discussion was conducted to remove Nicholas Andrews Inc as the Member(s) and add Nicholas Andrews, David Prom, William Brill and Jon Corbisez as Member(s)s and was approved. The capital contribution for the issuance is zero.

3. A discussion was conducted and vote was taken to issue 1,000,000 Founder's Common shares with full voting rights to each of Nicholas Andrews and David Prom and approved.  The capital contribution for the issuance is zero.

4. A discussion was conducted and vote was taken to issue 1,000,000 Founder's Common shares with full voting rights to each of William Brill and Jon Corbisez and approved.  The capital contribution for the issuance is zero.

5. A discussion was conducted concerning the admission of William Brill and Jon Corbisez as a Managers and approved. The capital contribution for the issuance is zero.

6. A discussion was conducted to verify and validate the manager/Member(s) ownership structure and voting rights. Nicholas Andrews, David Prom, William Brill and Jon Corbisez have equal ownership or 25% each. Nicholas Andrews, David Prom, William Brill and Jon Corbisez have equal shares with full voting rights.

IN WITNESS WHEREOF, The Company and the Member(s) have executed this Operating Agreement on the date first written above.

**MEMBER(S):**

_____ 5/15/19

Nicholas Andrews, Inc by: Nicholas Andrews, **Member being released**

9

_____  5-15-2019
Nicholas Andrews, **Member**

_____  5-15-2019
David Prom, **Member**

_____  5.15.2019
William Brill, **Member**

_____  5·15·2019
Jon Corbisez, **Member**

**COMPANY:**

**United Global Partners, L.L.C.**

By: _____  5/15/2019
Nicholas Andrews, **Manager**

By: _____  5-15-2019
David Prom, **Manager**

By: _____  5.15.2019
William Brill, **Manager**

By: _____  5·15·2019
Jon Corbisez, **Manager**

10

# EXHIBIT B

**AGREEMENT FOR THE
CULTIVATION, PRODUCTION AND SALE
OF
INDUSTRIAL HEMP RELATED PRODUCTS**

This Agreement For The Cultivation, Production And Sale Of Industrial Hemp Related Products (this "**Agreement**") is made and entered into as of June 20th, 2019 (the "**Effective Date**") by and between UNITED GLOBAL PARTNERS, LLC, an Arizona limited liability company ("**UGP**") and AVALON GARDENS SLOW FOOD ENTERPRISES, LLC, an Arizona limited liability company ("**AGFSE**").  UGP and AGFSE may be collectively referred to herein as the "**Parties**" and individually as a "**Party**."

**RECITALS**

WHEREAS, pursuant to Title 3; Chapter 2, Article 4.1 of the Arizona Revised Statues and Arizona Administrative Code §R 3-4-1001 et seq., Arizona's Industrial Hemp program as the same may be amended from time to time (the "**Hemp Rules**") the Arizona Department of Agriculture (the "**Department**") has issued licenses to AGFSE to act as a Hemp Nursery and a Hemp Grower; and

WHEREAS, pursuant to such licenses, AGFSE intends to operate a private farm of approximately 4.65 acres in southern Arizona (the "**Cultivation Facility**") for the purpose of developing, cultivating, harvesting, preparing, packaging, storing, and transporting industrial hemp (the "**Cultivation Services**"); and

WHEREAS, UGP has developed certain *cannabis sativa* L. (or "**hemp**") plant varieties having desirable genetic characteristics, and has also developed various methods, systems, and know-how for producing hemp pollen and feminized, high CBD% hemp seed, the intellectual property associated with which is identified in Schedule A hereto (the "**Licensed Intellectual Property**"); and

WHEREAS, UGP and AGFSE desire to enter into this Agreement for the Cultivation, Production and Sale of Industrial Hemp Related Products, pursuant to which UGP will agree to provide consultation services and equipment to AGFSE concerning or related to the propagation and planting of industrialized and feminized hemp seed, and the post-harvest separation and preparation for market of the biomass, seeds and stems, which items together with *cannabis sativa* L clones and seedling nursery stock constitute (the "**Products**") (such services are referred to as the "**Consultation Services**").  In return, and AGFSE has agreed to provide Cultivation Services; and

WHEREAS, AGFSE desires to acquire, and UGP desires to grant, a license for AGFSE to use the Licensed Intellectual Property to fulfill its obligations under this Agreement and for AGFSE's future hemp growing operations after expiration of this Agreement (the "**Purpose**").

WHEREAS, the parties intend to divide the revenue produced by the sale of the Products as more fully described herein.

Page **1** of **15**

6653241v3(68644.1)

**AGREEMENT**

NOW THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to the following terms and conditions:

1.    Term; Renewal; Termination.

(a)    Term.  This Agreement shall commence on the Effective Date and shall continue until December 31, 2020 (the "**Initial Term**"), unless and until earlier terminated as provided in Section 2(c).

(b)    Renewal.  Upon expiration of the Initial Term and the mutual agreement of the Parties, this Agreement may be renewed for successive one-year terms, or as the Parties otherwise agree in writing (each, a "**Renewal Term**" and together with the Initial Term, the "**Term**").  The terms, covenants and conditions of any Renewal Term shall be the same as the terms, covenants, and conditions in effect immediately prior to such renewal.

(c)    Termination.  Upon the occurrence of any one of the following events, either Party may terminate this Agreement prior to the end of the Initial Term or any Renewal Term by providing written notice to the other Party stating the intended date of termination: (i) any breach or default of this Agreement by the other Party, which, if and as permitted by Section 8(e) or Section 14 hereof, remains uncured; (ii) any grossly negligent or intentional or willful misconduct by the other Party; (iii) any federal enforcement action of the type described in Section 22 against UGP, AGFSE, or any of their respective affiliates, employees or independent contractors; (iv) any change or revocation of state or local law, regulation or licensing, which has the effect of prohibiting the legal operation of the Cultivation Facility, the performance of the Cultivation Services and/or the sale of the Products; provided, however, that any change that only makes compliance, operation, or costs of goods more expensive or difficult shall not provide a basis for termination under this clause (iv); (v) the revocation of, or the Department's refusal to approve an application to renew, AGFSE's licenses; (vi) either Party is prevented by law or act of God from performing its obligations hereunder and such Party gives written notice to the other Party thereof within a commercially reasonable period of time; or (vii) written notice by a party hereto of such party's intention to terminate this Agreement effective on the 30th day following such notice.  In the event of any termination of this Agreement pursuant to clauses (iii)-(vi), the Parties shall use reasonable commercial efforts to wind down operations in an organized and efficient manner.

(d)    Effect of Termination.  The Parties expressly acknowledge and agree that the termination of this Agreement shall not give rise to any expectation or consequential damages as a result thereof, nor shall it relieve either Party from its obligation to pay any amounts due to the other with respect to any Product harvested during the term of this Agreement. Additionally, if the termination occurs within thirty (30) days prior to or following a harvest (the "**Final Harvest**"), the Parties shall work together in good faith to complete the

6653241v3(68644.1)

harvest and market the Product resulting from such Final Harvest. Each Party shall be entitled to its share of the proceeds of the Final Harvest as this Agreement had not terminated.

2.      Obligations of AGFSE.  During the Term, AGFSE shall operate and manage the Cultivation Facility and provide the Cultivation Services, in accordance with best agricultural practices developed by AGFSE and consistent with the advice received by AGFSE as part of the Consultation Services, as well as other services as UGP may reasonably request and which AGFSE agrees to provide, from time to time.  In furtherance of the foregoing, the operation and management of the Cultivation Facility and performance of the Cultivation Services shall include and be subject to the following conditions which AGFSE covenants to observe and perform:

(a)      Cultivation Services.  AGFSE shall use the Cultivation Facility to apply approximately 4.65 acres for the cultivation, harvest, production, preparation and storage of industrial hemp all in compliance with all applicable rules, regulations and requirements, including without limitation, the Hemp Rules.  AGFSE shall take all actions it deems reasonably necessary or appropriate to comply with any change whatsoever in any applicable law, rule, statute, regulation, the entitlement and/or approval process, or other process or requirement related to the procurement, entitlement, compliance, development, operation or management of the Cultivation Facility that comes into being, occurs, accrues, becomes effective or otherwise becomes applicable or required after the Effective Date.  AGFSE shall erect two (2) semi-controlled-environment greenhouses. In the first greenhouse with a footprint of 2,880 square feet, (“**Greenhouse 1**”) AGFSE shall produce feminized pollen for application to its outdoor field crops.  In the second greenhouse, with a footprint of 2,160 square feet (“**Greenhouse 2**”) AGFSE shall produce cannabis ruderalis seed crops.  AGFSE shall be solely responsible to provide farming services, labor, land, infrastructure and farming expertise to produce industrial hemp biomass, smokable flower and seeds.

(b)      Standard of Care.  AGFSE will operate and manage the Cultivation Facility and perform the Cultivation Services in compliance with best industry practices, applicable law, permits and licenses, the terms of this Agreement, and the requirements under the Insurance Policies (as defined in Section 6) (the “**Standard of Care**”).

(c)      Conditions of Service.  AGFSE may utilize subcontractors (excluding Affiliates) to provide any of the Cultivation Services so long as such subcontractors are selected by AGFSE with reasonable care and AGFSE has reasonable assurances that such subcontractors can perform the Cultivation Services pursuant to the requirements of this Agreement, including the Standard of Care; provided, however, that no such utilization will relieve AGFSE of any of its obligations or liabilities under this Agreement.  Neither AGFSE nor the employees, contractors or agents of AGFSE providing Cultivation Services hereunder will be considered employees of UGP for any purpose.  AGFSE will be solely responsible for all matters pertaining to the employment, supervision, compensation, promotion, termination, daily direction and control of its employees and contractors.  In addition, AGFSE will be responsible for the proper classification of its employees and contractors and for the payment of all compensation, benefits and employer taxes related to such persons.  AGFSE will ensure that it has, and at all times will

have, a sufficient number of employees with appropriate skills necessary to perform the Cultivation Services.

(d)  Supplies, Equipment and Tools.  Except for those items described in Section 3(b) which shall be the responsibility of UGP, AGFSE shall be responsible for the selection, purchase and acquisition of all supplies, equipment and tools required to operate the Cultivation Facility (the "**Equipment**"), including, without limitation, all growing containers, growth medium, nutrients, gases, lights, gardening and trimming tools and any other items AGFSE deems necessary for the efficient operation of the Cultivation Facility.

(e)  Testing.  The parties cooperate and work together to implement all actions necessary to ensure the quality, safety and security of the Cultivation Facility and the Products produced at such facility, including providing product testing and analytics at industry standards for all industrial hemp grown, and Products produced and developed at the Cultivation Facility to ensure compliance with the Hemp Rules, and all other applicable rules, regulations, requirements and laws.  In addition, AGFSE will provide access to the Cultivation Facility as necessary to Arizona state officials in order to allow inspection and testing required by ARS § 3-316(B). AGFSE will provide UGP with copies of the results of any product testing.

(f)  Inventory.  AGFSE shall prepare and maintain at the Cultivation Facility a complete inventory of all Products produced at the Cultivation Facility, separated into the following categories: (i) growing plants by strain; (ii) harvested industrial hemp in cure; (iii) packaged biomass  (iv) packaged smokable flower, and (v) seeds.  AGFSE shall provide a monthly inventory report to UGP regarding the foregoing.

(g)  Access.  AGFSE shall provide such access to the Cultivation Facility to UGP as it deems necessary and appropriate to allow UGP to provide the Consultation Services, and shall ensure that other guests at the Cultivation Facility shall be kept to a minimum.  AGFSE shall ensure that all guests at the Cultivation Facility are escorted at all times by agent of AGFSE.

(h)  Compliance Monitor.  AGFSE hereby appoints Samuel Combs to serve as the compliance monitor for the Cultivation Facility, who shall have the responsibility and authority to ensure compliance with applicable laws and this Agreement (the "**Compliance Monitor**").  The Compliance Monitor shall serve as the contact for UGP and shall be knowledgeable at all times as to the state of compliance for the Cultivation Facility.  AGFSE may change the Compliance Monitor at any time in its sole discretion and shall give written notice to UGP of any such change.

(i)  Marketing.  The parties anticipate that UGP shall provide marketing services in accordance with Section 3 hereof.  Nevertheless, AGFSE may develop and maintain its own marketing programs and strategies for Products cultivated, harvested and prepared at the Cultivation Facility subject to all applicable rules, regulations and requirements.

(j)  Records. AGFSE shall maintain and keep all records related to the operation of the Cultivation Facility, including, without limitation, financial records, harvest

Page **4** of **15**

6653241v3(68644.1)

notes, reports, sales reports, sales invoices, tax filings, tax statements, loan applications, and fiscal audits.  Either Party shall have the right to demand review of the records of the Cultivation Facility.  Any such review shall be solely the expense of the Party requesting it.  AGFSE shall maintain cost accounting records and supporting documentation for seven (7) years after the pertinent period.  UGP or an agent designated by UGP shall have access to, and shall promptly comply with requests of UGP for, such records and supporting documentation sufficient in the judgment of UGP or its agent to audit such materials and to assess and verify all matters relating to costs and prices under this Agreement.

(k)    Costs and Expenses.  AGFSE shall be solely responsible for all costs and expenses necessary to operate and manage the Cultivation Facility and perform the Cultivation Services as contemplated by this Agreement, including, without limitation, all materials, equipment, vehicles, phones, computers and labor, including, without limitation, all wages, benefits (if any), taxes, withholding, workers' compensation insurance, payroll processing, uniforms, tools, training and education, and all other employee-related costs, except those expenses that are to be borne by UGP pursuant to Section 3(d), below.

3.    Obligations of UGP.

(a)    Consultation Services.  During the Initial Term and any Renewal Term of this Agreement, UGP shall provide to AGFSE expert advice regarding plant propagation, field planting, harvesting, drying, curing, soil preparation, watering and nourishing with respect to AGFSE's cultivation of industrial hemp plants (*cannabis sativa* L.), together with expert advice and on-site assistance at the time of pollen feminization, collection and application to AGFSE's field crops.  In addition, UGP shall provide expert advice regarding the harvesting, drying, curing and post-harvest processing of the industrial hemp, together with equipment and equipment operators to separate biomass, seeds, stem / chaff and dried harvested flowers.  All such advice shall be based on UGP's practical experience and industry best practices and shall be offered in a manner that maximizes the production capability of AGFSE in providing the Cultivation Services.

(b)    Seeds, Plants and Supplies.  UGP shall provide to AGFSE such feminized cannabis sativa clones (for pollen creation), seed, felt pots, potting soil, felt bags as AGFSE may reasonably require in order to maximize the production of feminized industrial hemp plants in its fields, pollen production in Greenhouse 1 and the production or *cannabis ruderalis* seed in Greenhouse 2.  UGP shall provide all liquid fertilizers AGSFE may reasonably require to maximize production of its greenhouse crops.

(c)    Marketing.  UGP shall use its best efforts to sell the Products resulting from AGFSE's Cultivation Services.  UGP shall sell the Products at the prevailing market price unless otherwise agreed in writing by the parties hereto.

(d)    Expenses.  All expenses of UGP in providing the Consultation Services and supplies listed above shall be borne exclusively by UGP.  Such expenses shall include, without limitation, travel, lodging, fuel, food, CBD hemp seeds, pollen, clones, employee or contractor costs shall be borne solely by UGP.  The parties acknowledge that UGP has already

6653241v3(68644.1)

provided to AGFSE approximately 24,000 seeds to allow AGFSE to commence planting its field crops.

(e)    Employees. Neither UGP nor the employees, contractors or agents of UGP will be considered employees or agents of AGFSE for any purpose. UGP will be solely responsible for all matters pertaining to the employment, supervision, compensation, promotion, termination, daily direction and control of its employees and contractors. In addition, UGP will be responsible for the proper classification of its employees and contractors and for the payment of all compensation, benefits and employer taxes related to such persons. UGP will ensure that it has, and at all times will have, a sufficient number of employees with appropriate skills necessary to perform the Consultation Services.

4.    Sale of Products.

(a)    Authorization to Sell. Either Party who is properly licensed, may sell the Products at or above the prevailing market rate in effect at the time of sale, as the same may change from time to time. Any party storing, transporting or selling the Products shall hold all required licenses for the activity in which it is engaging, and shall further act in full compliance with all applicable law and regulations including, without limitation, the Hemp Rules. In the event that either party sells Products, they shall cause the purchasing customer to remit payment directly to AGFSE. AGFSE shall be solely responsible for transporting the purchased Products to the customer following its receipt of payment therefor. Not less frequently than monthly, AGFSE shall remit to UGP the following percentages of the gross proceeds of each such sale:

- For the 2019 growing season, forty percent (40%); and
- For the 2020 growing season, thirty-five percent (35%) if AGFSE has ten (10) or fewer acres under cultivation and twenty percent (20%) if AGFSE has more than ten (10) acres under cultivation.

(b)    First Right of Refusal of UGP. Notwithstanding the right of either party to sell the Products resulting from AGFSE's Cultivation Services, upon written notice to AGFSE prior to any sale, UGP shall have the right to purchase part or all of the unsold Products held by AGFSE at the following percentages of gross income:

- For the 2019 growing season sixty percent (60%); and
- For the 2020 growing season, sixty-five percent (65%) if AGFSE has ten (10) or fewer acres under cultivation and eighty percent (80%) if AGFSE has more than ten (10) acres under cultivation,

of the greater of (i) the then prevailing market rate, or (ii) the price at which AGFSE or UGP have offered such Products for sale to a third party during the instant cycle or, if none, the immediately preceding cycle.

(c)    Ownership of Industrial hemp. The Parties acknowledge and agree that, until the Products are sold, all industrial hemp cultivated, harvested and prepared by AGFSE pursuant to this Agreement (including, without limitation, all seeds, plants, flowers, extracts, and every other part of the industrial hemp plant) shall at all times be the sole and exclusive property

Page **6** of **15**

of AGFSE, subject to the claims of UGP to a portion of the proceeds of sale Products as set forth herein.  In the event that UGP exercises its Right of Refusal under Paragraph (b) above, transfer of ownership shall occur at the Cultivation Facility following payment by UGP of the exercise price, and UGP will be solely responsible for the storage, loading, transportation and sale of such Products thereafter.

(d)    Recordkeeping.  AGFSE shall maintain full cost accounting records with respect to each sale of Product, and shall report all sales of Products and the gross proceeds thereof to UGP not less frequently than monthly.  In the event that UGP sells Products, it shall report such sales to AGFSE immediately following such sale including the Product or Products sold, the amount thereof and the sales price with respect to such Products.  UGP shall maintain, all records and supporting documentation relating to UGP's Product sales activities, and shall promptly comply with all requests of AGFSE to audit such materials and otherwise to assess and verify all Product-related matters.  All records shall be kept and maintained in accordance with Generally Accepted Accounting Principles.

5.    License Grant, Restrictions on Use, and Ownership.

(a)    License Grant. UGP hereby grants to AGFSE a non-exclusive, perpetual, non-transferable license to use the Licensed Intellectual Property in connection with the Purpose. For avoidance of doubt, and without limiting this license grant, UGP may: (a) produce clones of the plant varieties provided by UGP, (b) use the pollen and feminized seed produced by those plant varieties, and (c) use the methods and systems provided by UGP for producing its own feminized seeds and pollen.

(b)    Restrictions on Use. AGFSE shall treat the Licensed Intellectual Property as Confidential Information (defined below).

(c)    Ownership. Nothing in this Agreement shall be interpreted as an assignment or transfer of intellectual property rights from one Party to the other. UGP retains ownership of the Licensed Intellectual Property. AGFSE retains ownership of the intellectual property rights associated with any improvements developed solely by AGFSE during the course of using the Licensed Intellectual Property. AGFSE and UGP agree to engage in good faith efforts to allocate the ownership of any improvements jointly developed by the Parties during the Term.

6.    Mutual Non-Disclosure of Confidential Information.

(a)    Confidential Information. The term "**Confidential Information**" means any and all information that is disclosed or otherwise made available by a party hereto (the "**Disclosing Party**") to the other party hereto (the "**Receiving Party**") that the Disclosing Party considers proprietary or confidential, including but not limited to the Licensed Intellectual Property, plant varieties and genetics, seed production methods, pollen production methods, customer lists, unpublished patent applications, processes, specifications, designs, plans, drawings, software, data, database structures, internal processes, prototypes, client lists, billing records, business plans or methodologies, financial information, the terms of this Agreement, or

Page **7** of **15**

other business and/or technical information, and all copies and derivatives containing such Confidential Information. Confidential Information may be in any form or medium, tangible or intangible, and may be communicated in writing, orally, or through visual observation. Confidential Information shall also include any information regarding the terms and conditions of this Agreement.

(b)     Restrictions on Use and Disclosure. The Receiving Party shall (i) use any Confidential Information only for the Purpose, (ii) shall hold Confidential Information in confidence using the same degree of care as it normally exercises to protect its own proprietary Confidential Information, but not less than reasonable care, taking into account the nature of the Confidential Information, and shall grant access to Confidential Information only to its employees who have a need to know, (iii) shall cause its employees to comply with the provisions of this Agreement applicable to the Receiving Party, (iv) shall reproduce Confidential Information only to the extent essential to fulfilling the Purpose, and (v) shall prevent disclosure of Confidential Information to third parties. The Receiving Party may, however, disclose the Confidential Information to its attorneys, advisors, consultants and contractors with a need to know, provided that by doing so, the Receiving Party agrees to advise them of their obligations, and the Receiving Party will be responsible for any violation of the terms of this Agreement by its employees, attorneys, advisors, consultants and contractors and will indemnify the Disclosing Party for any breach of those obligations. The Receiving Party will immediately notify the Disclosing Party upon discovery of any loss, breach, or unauthorized disclosure of the Confidential Information of the Disclosing Party.

(c)     Exceptions. The foregoing restrictions on each Party's use or disclosure of Confidential Information shall not apply to information that the Receiving Party can demonstrate: (i) was independently developed by or for the Receiving Party without reference to the Confidential Information, or was received without restrictions; (ii) has become generally available to the public without breach of confidentiality obligations of the Receiving Party; (iii) was in the Receiving Party's possession without restriction or was known by the Receiving Party without restriction at the time of disclosure; is the subject of a subpoena or other legal or administrative demand for disclosure; provided, however, that the Receiving Party has given the Disclosing Party prompt notice of such demand for disclosure and the Receiving Party reasonably cooperates with the Disclosing Party's efforts to secure an appropriate protective order; or is rightfully received by the Receiving Party from a third party free of any obligation of confidentiality.

(d)     Enforcement.  The parties agree and acknowledge that disclosure of their Confidential Information would be harmful to the business of the owner thereof, and that legal damages would be insufficient to compensate the owner thereof in the event of a wrongful disclosure of such Confidential Information.  Accordingly, in addition to any legal damages, the non-disclosing party shall be entitled to seek injunctive or other equitable relief to prevent or remedy any such wrongful disclosure, without the requirement of a bond.

7.     Representations and Warranties.

(a)     Representations and Warranties of AGFSE.   AGFSE represents and

6653241v3(68644.1)

warrants to UGP that: (i) it is duly organized, validly existing and in good standing as a limited liability company under the laws of the State of Arizona and is in good standing in the State of Arizona; (ii) it has the full right, power and authority to enter into this Agreement and to perform its obligations hereunder; (iii) the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate action of AGFSE; and (iv) when executed and delivered by AGFSE, this Agreement will constitute the legal, valid and binding obligation of AGFSE, enforceable against AGFSE in accordance with its terms.

(b)     Representations and Warranties of UGP.  UGP represents and warrants to AGFSE that: (a) it is duly organized, validly existing and in good standing as a limited liability company under the laws of the State of Arizona and is in good standing in the State of Arizona; (b) it has the full right, power and authority to enter into this Agreement and to perform its obligations hereunder; (c) the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate action of AGFSE; (d) when executed and delivered by AGFSE, this Agreement will constitute the legal, valid and binding obligation of AGFSE, enforceable against AGFSE in accordance with its terms; (e) UGP does not know of and has not received any claims of third party rights in the Licensed Intellectual Property or data received from the Licensed Intellectual Property; and (f) the Licensed Intellectual Property as provided will conform in all material respects with the Licensed Intellectual Property's specification, documentation, and definitions.

8.     Indemnification.

(a)     Mutual Indemnification.  Each party shall indemnify and save harmless the other party, its agents, officers, directors, members, managers, directors, employees, and Affiliates from and against any and all actions, claims, costs (including attorneys' fees), fines, damages, judgments, and liabilities whatsoever in any way relating to, or in any degree caused by (i) any breach by the indemnifying party of this Agreement; (ii) actions or failures to act by the indemnifying party in performing its obligations under this Agreement; (iii) obligations regarding the compensation of, and payroll taxes, workman's compensation liability and social security obligations related to the indemnifying party's employees and independent contractors; (iv) any and all claims against the indemnified party of whatever nature arising from any act, omission or negligence of the indemnifying party or, its contractors, licensees, agents, servants, employees, invitees, or visitors, arising from any accident, injury, damage or any other reason; (v) any claims, suits, charges, proceedings or actions for workers' compensation benefits or awards filed against UGP by or concerning AGFSE's employees; (vi) any grossly negligent acts, omissions or deliberate, willful or intentional misconduct or malfeasance, of the indemnifying party's employees while performing its obligations under this Agreement; (vii) any violation by the indemnifying party or its employees, contractors or agents of applicable law or regulations relating to the activities contemplated under this Agreement, including state and federal laws relating to industrial hemp and including any rules or regulations promulgated by the Department or the U.S. Department of Agriculture or other federal agency; and (viii) any damage to the property or facilities of the indemnified party due to the negligence or willful misconduct of the indemnifying party.

(b)     Additional Indemnification by UGP.  During the Term and for a period of two (2) years following expiration of the Term, UGP shall indemnify, defend, and hold AGFSE harmless from and against all liability, claims, damages, losses, and expenses (including, without limitation attorney's fees and costs of litigation (not limited to taxable costs)) that might be incurred by AGFSE by reason of a claim by a third party that the Licensed Intellectual Property infringes or misappropriates the intellectual property rights of any third party existing as of the Effective Date.

(c)     Indemnification Procedure. The Parties agree that, upon receipt of any third-party claim that might give rise to either party seeking indemnity under this Article, that Party (the "**Claimant**") shall give written notice within fifteen (15) business days of receipt of the claim to the party from whom indemnification may be sought (the "**Indemnitor**"). The Indemnitor shall be entitled at its own expense to participate in the defense of any claim or action against Claimant.  The Indemnitor shall have the right to assume the entire defense of such claim, provided that Indemnitor (i) gives written notice of its desire to defend such claim to Claimant within fifteen (15) business days after Indemnitor's receipt of the notice of the third-party claim; (ii) Indemnitor's defense of the claim shall be without cost to Claimant or prejudice to Claimant's rights under this Article; (iii) counsel chosen by Indemnitor to defend the claim shall be reasonably acceptable to Claimant; (iv) the Indemnitor shall bear all costs and expenses in connection with the defense of such claim; and (v) Claimant shall have the right to receive periodic reports from Indemnitor regarding the status of the defense of the claim.

9.     Inspections and Audits.  The Parties acknowledge and agree that the Cultivation Facility is subject to inspection by the Department pursuant to A.R.S. § 3-316.  The parties shall (a) fully cooperate with any such inspections, (b) provide the other party immediate notice of any inspection of which a party becomes aware, and (c) maintain the Cultivation Facility, any facility of UGP, and any facilities used in the transportation or storage of Products in compliance with all local, state, and federal laws and regulations at all times.  In addition, the Parties acknowledge and agree that the state or federal government may perform audits of their activities undertaken pursuant to this Agreement.  Ether party may participate in any audits of the other party's books and records conducted by any accounting firms or any governmental entities.

10.     Taxes.  Each of the Parties shall be responsible for its own taxes (including all personal property taxes) which are incurred as a result of such Party's activities pursuant to this Agreement, and no Party shall be liable to any other Party for contribution or otherwise related to the payment of any taxes.  Any taxes imposed shall be paid at the level they are imposed.

11.     Events of Default.  A Party shall be in default hereunder if any one or more of the following events happen, and the defaulting Party fails to cure such default within 30 days following written notice from the non-defaulting Party (or such lesser period of time required under Arizona laws): (i) the defaulting Party fails to act in strict accordance with applicable law including, without limitation, the Hemp Rules and applicable local, state or federal law; (ii) the filing by the defaulting Party of a voluntary petition of bankruptcy or a voluntary petition or answer seeking reorganization, rearrangement, or readjustment of its debts, or any relief under any bankruptcy or insolvency act or law, now or hereafter existing, or any agreement by the

Page **10** of **15**

defaulting party indicating consent to, approval of, or acquiescence in, any such petition or proceeding or face involuntary bankruptcy; (iii) the application by the defaulting Party or the consent or acquiescence of the defaulting Party in the appointment of a receiver or trustee for all or a substantial part of any of its properties or assets; (iv) the making by the defaulting Party of a general assignment for the benefit of creditors; (v) the inability of the defaulting Party or the admission of defaulting Party in writing of its inability to pay its debts as they mature; (vi) the filing of an involuntary petition against defaulting Party seeking reorganization, rearrangement or readjustment of its debts or for any other relief under any bankruptcy or insolvency act or law, now or hereafter existing, or the involuntary appointment of a receiver or trustee for defaulting Party for all or a substantial part of its property or assets, or the issuance of a warrant of attachment, or execution of similar process against a substantial part of the property of defaulting Party and the continuance of such for 120 days undismissed or undischarged; or (vii) the failure by defaulting Party to perform or comply with any covenant or agreement in this Agreement.

12.    Notices.  The Parties acknowledge and agree that any notice required under this Agreement shall be given in writing and shall be delivered personally, via overnight delivery service with tracking, email, or by certified mail, postage prepaid, addressed to the Party for whom intended as follows:

    1.    To AGFSE:

        Avalon Gardens Slow Food Enterprises, LLC
        P.O. Bpx 4106
        Tubac, AZ  85646
        Attn:  Samuel Combs
        Phone:  520-860-0617
        Email: taliseen@avalongardens.org

    With copy to (which shall not constitute service):

        Jennings, Strouss & Salmon, PLC
        1 East Washington Street, Ste. 1900
        Phoenix, Arizona 85014
        Attn: Otto Shill
        Email: oshill@jsslaw.com

(b)    To UGP:    United Global Partners, LLC
        7440 E. Pinnacle Peak Rd., Ste. 140
        Scottsdale, AZ  85255
        Attn:    Nick Andrews
        Email: nicholasbandrews@cox.net

    With copy to (which shall not constitute service):

6653241v3(68644.1)

13.    <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

14.    <u>Assignment</u>. Neither Party shall assign, transfer or convey this Agreement, in whole or in part, without the express prior written consent of the other party. A change in control or ownership of a Party shall be deemed an assignment of this Agreement and shall require the express prior written consent of the other Party. Any attempted assignment of this Agreement by Party without the consent of the other Party shall be considered void. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

15.    <u>Severability</u>. In the event any one or more provisions of this Agreement or of any instrument or other document delivered pursuant hereto or in connection herewith shall, for any reason, be held to be invalid, illegal, or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other instrument or document, and this Agreement and such other instruments and documents shall be interpreted and construed as if such invalid, illegal or unenforceable provision had never been contained therein.

16.    <u>Governing Law</u>. This Agreement shall be governed, interpreted, performed and enforced solely in accordance with the laws of the State of Arizona, without reference to principles of conflicts of law; provided, however, notwithstanding anything to the contrary herein.

17.    <u>Neutral Interpretation</u>. The Parties acknowledge and agree that they have both participated in the negotiation of this Agreement and its terms, and have had the opportunity to have this Agreement reviewed by an attorney of their choosing. The Parties agree that no rules of construction or interpretation shall be applied to this Agreement which would favor one party over the other, and that the Agreement shall be interpreted neutrally.

18.    <u>Dispute Resolution</u>.

(i)    <u>Mediation</u>. Except if emergency injunctive relief is required, any dispute, controversy, or claim arising out of or relating to this Agreement (a "**Dispute**") that cannot be settled through negotiation shall be mediated by the parties before a single mediator in the City of Phoenix, Arizona. Any party to this Agreement may invoke the right to mediation set forth in this <u>Section 19</u> by sending written notice to the other party or parties of such invocation and setting forth in adequate detail the nature of the matter to be mediated. The parties to the mediation jointly shall appoint the mediator within 15 calendar days of receipt of the written

6653241v3(68644.1)

notice. The mediation proceedings shall commence and be diligently pursued by the parties to this Agreement within 15 calendar days of the appointment of the mediator. Each party to the mediation shall bear its own cost and expense incurred with respect to the mediation. The cost of the mediator and the mediation procedure shall be borne equally by the parties to the mediation.

(ii)    Arbitration. Any Dispute that cannot be settled or resolved by negotiation or through mediation to the satisfaction of all parties to the mediation within 90 days of the notice of the invocation of mediation pursuant to Section 19(a) above shall be resolved through binding arbitration. Any party may invoke the right to arbitration set forth in this Section 19(b) by sending written notice to the other party or parties of such invocation. The parties shall name a single arbitrator within 20 calendar days after such written notice. If the parties fail to select an arbitrator within 20 calendar days as required herein, the then Presiding Judge of the Maricopa County, Arizona, Superior Court shall appoint the arbitrator. The arbitrator shall render a decision within 60 calendar days after his or her appointment and shall conduct all proceedings pursuant to the then existing rules of the American Arbitration Association ("**AAA**") governing commercial transactions, to the extent such rules are not inconsistent with Arizona law and this Agreement. Judgment upon the award rendered pursuant to the arbitration may be entered in any court having jurisdiction. The cost of the arbitration procedure shall be borne by the losing party or, if the decision is not clearly in favor of one party or the other, then such costs shall be borne as determined by the arbitrator. The arbitration procedure provided for in this Agreement shall be binding arbitration and shall be the sole and exclusive remedy for any applicable Dispute.

19.    Venue. Any arbitration or other action to enforce or interpret this Agreement shall be in Maricopa County, Arizona.

20.    Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

21.    Federal Government Action. The Parties acknowledge that they are aware of and fully understand that despite the State of Arizona's industrial hemp laws and the terms and conditions of this Agreement, the United States Department of Agriculture has yet to issue regulations with respect to the production, processing and sale of industrial Hemp. In the event of adverse federal enforcement action associated with the Parties' activities described in this Agreement, the Parties agree to hold each other harmless and agree to be individually responsible for any attorneys' fees associated with defending such actions. The Parties also agree to waive illegality as a defense to any contract enforcement action related to this Agreement.

22.    Relationship of the Parties. This Agreement does not create any partnership, joint venture or similar business relationship between the Parties, and neither party shall be deemed to be the employee or agent of the other. Except as set forth in Section 6, neither party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement or undertaking with any third party.

Page **13** of **15**

6653241v3(68644.1)

23.    Entire Agreement.  This Agreement represents the entire understanding between the parties with respect to the subject matter hereof and supersedes all other negotiations, agreements, representations and covenants, oral or written.  All of the Recitals hereto are hereby incorporated within the Agreement.  In the event of any conflict between this Agreement and any other Agreement between the parties, the terms and provisions of this Agreement shall control, unless specifically varied by a subsequent Agreement.

24.    Further Assurances.  The parties shall execute such additional documents and take such additional actions as may be necessary or appropriate to effect the intent and purpose of this Agreement as set forth herein.

25.    Survival of Provisions.  The obligations of the Parties under Sections 2(c), 2(d), 2(j), 2(l), 3(c), 3(d), 3(e), 4, 5, 6, 7, 8, 9, 10, 11, 21, 23, and 24 shall survive the termination of this Agreement.

26.    Counterpart Execution.  The Parties may execute this Agreement in counterparts, all of which, when considered together, shall constitute one agreement.

(Signature page follows)

6653241v3(68644.1)

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed and delivered by their authorized representatives as of the Effective Date.

Avalon Gardens Slow Food Enterprises, LLC,
an Arizona limited liability company

By: _____
Catherine J. Lilly, Manager

United Global Partners, LLC,
an Arizona limited liability company

By: _____
William Brill, CEO

6653241v3(68644.1)

# EXHIBIT C

PROMISSORY NOTE

$100,000                                                      September 23, 2019

FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, UNITED GLOBAL PARTNERS, LLC, an Arizona Limited Lability Company (the "**Maker**"), hereby unconditionally promises to pay to the order of Jim Larson, Ron Stalica, Grant King and Norm Sendler (Who are equal partners and will all receive 25% of the total principal and interest) (the "**Noteholders**"), the principal amount of $100,000 (the "**Loan**"), together with a $20,000 increase ("Increase") thereon, as provided in this Promissory Note (this "**Note**"). This Note is being delivered by Maker.

Payment Schedule. The principal amount plus the Increase of the Loan shall be repaid by no later than December 31st, 2019.  The principal and interest will be paid from the proceeds of the Seed Harvest from the Avalon Gardens Slow Food Enterprises, LLC AGREEMENT FOR THE CULTIVATION, PRODUCTION AND SALE OF INDUSTRIAL HEMP RELATED PRODUCTS.

Final Payment. The aggregate unpaid principal amount of the Loan plus the Increase thereon shall be due and payable on December 31st 2019.

Optional Prepayment. Maker may prepay the Loan in whole or in part at any time or from time to time without penalty or premium by paying the outstanding principal amount plus the Increase, or any portion thereof.

Payment Mechanics. All payments of interest and principal shall be made by check or wire transfer of immediately available funds to Noteholder's account at a bank specified by Noteholder in writing to Maker from time to time.

Business Day Convention. Whenever any payment to be made hereunder shall be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension will not be taken into account in calculating the amount of interest payable under this Note. As used herein, "**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in Phoenix, Arizona are authorized or required by law to close.

Event of Default. An "Event of Default" shall be deemed to have occurred if; Maker fails to pay when due hereunder and such failure continues for ten (10) days after written notice thereof to Maker, upon the occurrence of an Event of Default and at any time thereafter during the continuance of such Event of Default, Noteholder may, at its option by written notice to Maker, declare the entire principal amount of this Note, together with the Increase, immediately due and payable.

Miscellaneous.

Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be given to Maker at 7440 E Pinnacle Peak Rd., Suite #140 Scottsdale, AZ 85255.

Headings. The headings in this Note are for reference only and shall not affect the interpretation of this Note.

Successors and Assigns. THIS NOTE MAY NOT BE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL IN FORM AND SUBSTANCE ACCEPTABLE TO THE COMPANY AND ITS COUNSEL THAT SUCH REGISTRATION IS NOT REQUIRED. Maker may not assign or transfer this Note or any of its rights hereunder without the prior written consent of Noteholder. This Note shall inure to the benefit of and be binding upon the parties and their permitted assigns.

Amendment and Modification. This Note may only be amended, modified or supplemented by an agreement in writing signed by Maker and Noteholder.

Waiver. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Note shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Governing Law. This Note shall be governed by and construed in accordance with the internal laws of the State of Arizona without giving effect to any choice or conflict of law provision or rule (whether of the State of Arizona or any other jurisdiction).

Submission to Jurisdiction. Any legal suit, action or proceeding arising out of or based upon this Note or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of Arizona in each case located in Maricopa County, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

Waiver of Jury Trial. Each party acknowledges and agrees that any controversy which may arise under this Note is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Note or the transactions contemplated hereby.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Maker caused this Note to be executed as of the date first written above by its duly authorized officer.

UNTIED GLOBAL PARTNERS, LLC.

By:

     Name: Nicholas B. Andrews
     Title:   Executive Chairman

# EXHIBIT D

PROMISSORY NOTE

$100,000                                                          September 10, 2019

FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, UNITED GLOBAL PARTNERS, LLC, an Arizona Limited Lability Company (the "**Maker**"), hereby unconditionally promises to pay to the order of Marc Rosenberg (the "**Noteholder**"), the principal amount of $100,000 (the "**Loan**"), together with a $20,000 increase ("**Increase**") thereon, as provided in this Promissory Note (this "**Note**"). This Note is being delivered by Maker.

Payment Schedule. The principal amount plus the Increase of the Loan shall be repaid by no later than March 31st, 2020.  The principal and interest will be paid from the proceeds of the Seed Harvest from the Avalon Gardens Slow Food Enterprises, LLC AGREEMENT FOR THE CULTIVATION, PRODUCTION AND SALE OF INDUSTRIAL HEMP RELATED PRODUCTS.

Final Payment. The aggregate unpaid principal amount of the Loan plus the Increase thereon shall be due and payable on March 31st, 2020.

Optional Prepayment. Maker may prepay the Loan in whole or in part at any time or from time to time without penalty or premium by paying the outstanding principal amount plus the Increase, or any portion thereof.

Payment Mechanics. All payments of interest and principal shall be made by check or wire transfer of immediately available funds to Noteholder's account at a bank specified by Noteholder in writing to Maker from time to time.

Business Day Convention. Whenever any payment to be made hereunder shall be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension will not be taken into account in calculating the amount of interest payable under this Note. As used herein, "**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in Phoenix, Arizona are authorized or required by law to close.

Event of Default. An "Event of Default" shall be deemed to have occurred if; Maker fails to pay when due hereunder and such failure continues for ten (10) days after written notice thereof to Maker, upon the occurrence of an Event of Default and at any time thereafter during the continuance of such Event of Default, Noteholder may, at its option by written notice to Maker, declare the entire principal amount of this Note, together with the Increase, immediately due and payable.

Miscellaneous.

100K Rec'd.
9/12/2019.

Equity in the Brand 3100. UNITED GLOBAL PARTNERS, LLC, is launching a new brand called 3100. Marc Rosenburg will receive a 10% net profit from this brand as well as a master distributor agreement with master distributor pricing as an incentive.

Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be given to Maker at 7440 E Pinnacle Peak Rd., Suite #140 Scottsdale, AZ 85255.

Headings. The headings in this Note are for reference only and shall not affect the interpretation of this Note.

Successors and Assigns. THIS NOTE MAY NOT BE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL IN FORM AND SUBSTANCE ACCEPTABLE TO THE COMPANY AND ITS COUNSEL THAT SUCH REGISTRATION IS NOT REQUIRED. Maker may not assign or transfer this Note or any of its rights hereunder without the prior written consent of Noteholder. This Note shall inure to the benefit of and be binding upon the parties and their permitted assigns.

Amendment and Modification. This Note may only be amended, modified or supplemented by an agreement in writing signed by Maker and Noteholder.

Waiver. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Note shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Governing Law. This Note shall be governed by and construed in accordance with the internal laws of the State of Arizona without giving effect to any choice or conflict of law provision or rule (whether of the State of Arizona or any other jurisdiction).

Submission to Jurisdiction. Any legal suit, action or proceeding arising out of or based upon this Note or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of Arizona in each case located in Maricopa County, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

Waiver of Jury Trial. Each party acknowledges and agrees that any controversy which may arise under this Note is likely to involve complicated and difficult issues and, therefore, each such

party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Note or the transactions contemplated hereby.

IN WITNESS WHEREOF, Maker caused this Note to be executed as of the date first written above by its duly authorized officer.

UNTIED GLOBAL PARTNERS, LLC.

By:_____

    Name: Nicholas B. Andrews
    Title:  Executive Chairman

# EXHIBIT E

AZ Corporation Commission

04064645

AZ CORPORATION COMMISSION
FILED

NOV 1 3 2012

FILE NO. L18033328-0   **ARTICLES OF ORGANIZATION**

Pursuant to A.R.S. section 29-632 the undersigned states as follows:

1)   The name of the limited liability company is United Global Partners, L.L.C.

2)   The address of the registered office in Arizona is

> 7440 E. Pinnacle Peak, #140
> Scottsdale, AZ 85255

located in the County of Maricopa.

3)   The name and address of the statutory agent is:

> Nicholas Andrews
> 7440 E. Pinnacle Peak #140
> Scottsdale, AZ 85255

Acceptance of Appointment By Statutory Agent

I, Nicholas Andrews, having been designated to act as Statutory Agent, herby consent to act in that capacity until removed or resignation is submitted in accordance with the Arizona Revised Statues.

_____          11/9/12
Nicholas Andrews                                            Date

4)      The latest date on which the limited liability company is to dissolve is
        December 31, 2062.

5)      Management of the limited liability company is reserved to the managers, who are:

Nicholas Andrews                    David Prom
7440 E Pinnacle Peak #140           7440 E. Pinnacle Peak #140
Scottsdale, AZ 85255                Scottsdale, AZ 85255

_____  11/8/12      _____  11-8-2012
Nicholas Andrews   Date          David Prom          Date

6)      The names and addresses of each person who is a member are:

Nicholas Andrews, Inc
7440 E Pinnacle Peak #140
Scottsdale, AZ 85255

_____  11/8/12
Nicholas Andrews, Shareholder   Date